[No. B019073. Second Dist., Div. Seven. Aug. 26, 1986.]

CHARM MURO, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
ANJAC FASHION BUILDING, INC., Real Party in Interest.

**COUNSEL**

Matz, Brody & Albert and Jeffrey A. Matz for Petitioner.

No appearance for Respondent.

Hast & Sabatasse and W. T. Maskey for Real Party in Interest.

**OPINION**

**THOMPSON, J.**—This is a petition for writ of mandate challenging the superior court's order sustaining the demurrer without leave to amend by real party in interest, Anjac Fashion Building, Inc. (Anjac) to a cause of action by petitioner Charm Muro for strict liability. At issue is whether the holding of *Becker* v. *IRM Corp*. (1985) 38 Cal.3d 454 [213 Cal.Rptr. 213,

698 P.2d 116, 48 A.L.R.4th 601] (hereafter *Becker*), that a landlord who leases dwellings is strictly liable in tort for injuries resulting from any latent defects existing on the premises should also apply to a landlord who leases commercial property. For the reasons to follow, we decline to extend *Becker* to the commercial lessor of commercial real property.

### Facts and Procedural Background Below

■ The allegations of the second amended complaint, which we must assume as true (*J'Aire Corp.* v. *Gregory* (1979) 24 Cal.3d 799, 803 [157 Cal.Rptr. 407, 598 P.2d 60]), establish that Anjac owns and operates a commercial property. Petitioner, an employee of one of Anjac's commercial tenants, slipped and fell on the stairs between the fifth and sixth floors near the women's rest area. The premises were defective when rented to petitioner's employer because the stairway was slippery and provided no runner on the flooring to prevent petitioner and others from falling. The substantial danger was not readily apparent, and adequate warnings were not given.

Petitioner originally filed a complaint for negligence only. Over objection by Anjac, she was granted leave to amend her complaint to state a second cause of action for strict liability. Anjac's demurrer to the strict liability cause of action of the first amended complaint was sustained with leave to amend on the ground that "'*Becker* extended strict liability concepts to residential landlords/tenant settings, and the analysis is not extended to commercial buildings.'" Petitioner filed a second amended complaint and Anjac's subsequent demurrer to the strict liability cause of action therein was sustained without leave to amend. We granted an alternative writ of mandate to determine whether the rationale of *Becker* required extension of strict liability in tort to the landlord for a defective stairway in the commercial premises herein.

### Discussion

■■ ■■ Petitioner claims that she has stated a valid cause of action in strict liability against her employer's landlord for a defective stairwell in the commercial premises under the holding of *Becker*.[1] We disagree.

---

[1]Preliminarily we reject petitioner's procedural contention that Anjac should have been precluded from demurring to petitioner's amended complaint because, in granting the motion for leave to amend over Anjac's objections, a superior court judge had ruled that *Becker* was applicable. A ruling granting leave to amend does not bar a demurrer based on grounds urged in opposition to the motion. (See, e.g., *Scott* v. *McPherson* (1914) 168 Cal. 783, 786 [145 P. 529]). An intermediate ruling on the pleadings, even the overruling of a demurrer, is not res judicata; another judge of the same court exercising jurisdiction over the cause

I

*Becker Decision*

In *Becker, supra,* 38 Cal.3d 454, our Supreme Court extended the law of strict liability in tort to lessors of residential property. The plaintiff in *Becker,* a tenant in a 36-unit apartment building, was injured when he slipped and fell through an untempered shower glass door. ■ The *Becker* court held: "[A] landlord engaged in the business of leasing *dwellings* is strictly liable in tort for injuries resulting from a latent defect in the premises when the defect existed at the time the premises were let to the tenant. [Fn. omitted.]" (*Id.,* at p. 464; italics added.)

■ Neither the language nor the rationale of the *Becker* decision indicates any intent to apply the strict liability doctrine announced therein to landlords who lease commercial or industrial property. Rather, the *Becker* court's analysis focuses on the development of the duties of a landlord in the business of providing "housing accommodations" to renters against the background of a need for safe and adequate housing where the modern urban residential tenant, like the ordinary consumer, is powerless to protect himself.

Beginning its analytical review of the development of the tort of strict liability, starting with *Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049], and of the

---

may reverse or modify the prior ruling. (See 2 Witkin, Cal. Procedure (3d ed. 1985) Courts, § 194, p. 221; 5 Witkin, *supra,* Pleading, § 934, pp. 370-371.)

We also reject Anjac's contention that landlords cannot be subject to strict liability for injuries sustained outside the demised premises in a common area. Had the injury here been caused by a latent defect in the common area of an apartment house, it would appear that petitioner could state a strict liability cause of action. Strict liability in tort applies, of course, to a bystander. (*Elmore* v. *American Motors Corp.* (1969) 70 Cal.2d 578; 586-587 [75 Cal.Rptr. 652, 451 P.2d 84, 33 A.L.R.3d 406].) When defects exist in common areas under the landlord's control, the landlord's lack of actual knowledge should not constitute an excuse, because the landlord has the legal duty to inspect and maintain those areas. (See Cal. Residential Landlord-Tenant Practice (Cont.Ed.Bar 1986) § 3.33, p. 159.) Moreover, the implied warranty of habitability covers the defects in common areas of the residential building as well as in a tenant's apartment. (*Hinson* v. *Delis* (1972) 26 Cal.App.3d 62, 70 [102 Cal.Rptr. 661], disapproved on other grounds in *Knight* v. *Hallsthammar* (1981) 29 Cal.3d 46, 55, fn. 7 [171 Cal.Rptr. 707, 623 P.2d 268]; see Cal. Residential Landlord-Tenant Practice, *supra,* § 3.24, p. 149.) The Civil Code specifically includes stairways in good repair as a requirement for tenantability of a dwelling (see Civ. Code, § 1941.1, subd. (h)), and such a standard is also relevant to the definition of uninhabitability (see *Knight* v. *Hallsthammar, supra,* 29 Cal.3d at pp. 58-59; *Green* v. *Superior Court* (1974) 10 Cal.3d 616, 637 [111 Cal.Rptr. 704, 517 P.2d 1168]).

development of duties and liability of a landlord, *Becker* pointed to the historical basis of strict liability in the implied warranty doctrine of fitness for intended use.[2] Moreover, throughout its opinion, the *Becker* court paralleled the development of these two related doctrines, implied warranty and strict liability in tort, in departing from the early common law theories in the field of residential real property.

The *Becker* court first traced the application of the warranty doctrine "where appropriate to those engaged in the real estate business" (38 Cal.3d at pp. 459-460), by citing cases where the California courts implied by law a warranty of fitness and quality with respect to the construction of new housing units. (See, e.g., *Aced* v. *Hobbs-Sesack Plumbing Co.* (1961) 55 Cal.2d 573, 580-583 [12 Cal.Rptr. 257, 360 P.2d 897] [implied warranty on heating system installed in home]; *Pollard* v. *Saxe & Yolles Dev. Co.* (1974) 12 Cal.3d 374 [115 Cal.Rptr. 648, 525 P.2d 88] [implied warranty of quality by builder or seller of new homes].) It then reviewed the similar development in applying strict liability in tort "where appropriate to those engaged in real estate businesses who impliedly represent the quality of their product." (*Becker, supra,* 38 Cal.3d at p. 460.) Again, the "appropriate" cases solely involved residential construction—i.e., the application of strict liability in tort to builders, developers, and subdividers of mass-produced homes or residential lots. (See, e.g., *Kriegler* v. *Eichler Homes, Inc.* (1969) 269 Cal.App.2d 224 [74 Cal.Rptr. 749] [builder-developer of mass-produced homes strictly liable for defectively installed radiant heating systems]; *Avner* v. *Longridge Estates* (1969) 272 Cal.App.2d 607 [77 Cal.Rptr. 633] [strictly liable for unstable fill of residential lot].)

Turning to the landlord-tenant relationship, the court then stressed that a "similar" development had also occurred in that field with the departure from the traditional common law rules which had imposed no duty to render leased premises habitable or to repair absent an express contract. The *Becker* court explained that the "'judicial and statutory trend'" toward "'increasing the responsibility of the landlord'" to provide premises suitable for the tenant's intended use "'reflects a view that no one should be allowed or

---

[2]The *Becker* court noted that the justification for establishing a doctrine of strict liability in tort was not a concern that warranty law failed to adequately define the manufacturer's duty but that the intricacies of the law of sales applicable to commercial transactions might defeat the obvious representation of safety for intended use by the manufacturer. (38 Cal.3d at p. 459.) The doctrine of strict liability evolved from the problems that sometimes accompany the implied warranty rationale. (See Comment, *Landlord Tort Liability in California: Are the Restrictive Common Law Doctrines on Their Way Out?* (1975) 12 San Diego L.Rev. 401, 411.) It has been pointed out that "the doctrine of strict liability is hardly more than what exists under implied warranty when stripped of the contract doctrines of privity, disclaimer, requirements of notice of defect, and limitations through inconsistencies with express warranties." (*Shepard* v. *Alexian Brothers Hosp.* (1973) 33 Cal.App.3d 606, 614-615 [109 Cal.Rptr. 132].)

forced to live in unsafe and unhealthy *housing.*'" (*Becker, supra,* 38 Cal.3d at p. 461, citing Rest.2d Property, Landlord and Tenant, ch. 5, p. 150, italics added.) *Becker* analyzed the two-fold evolution in California: Civil Code statutes (see, e.g., § 1941 et seq.) imposed obligations on lessors of dwellings to make them tenantable which, as a matter of public policy, could not be waived; and the judicial decisions recognized that "a lease for a dwelling contains an implied warranty of habitability" (38 Cal.3d at p. 462). Particular emphasis was placed on the implied warranty of habitability and the rationale of *Green* v. *Superior Court, supra,* 10 Cal.3d 616, which analogized the modern urban residential tenant to the normal defenseless consumer and held that the breach of implied warranty of habitability may be urged as a defense in an unlawful detainer proceeding.

As the *Becker* court indicated, its extension of strict liability in tort to injuries suffered by a residential tenant resulting from a latent defective condition of premises was due to its previous holdings that residential leases contain an implied warranty of habitability. (See Note, *California Supreme Court Survey* (1985) 13 Pepperdine L.Rev. 201, 256; see also *Becker, supra,* 38 Cal.3d at p. 462.) After noting that its prior decisions had not discussed "whether or to what extent breach of the implied warranty of habitability might provide a basis for recovery of tort damages for injuries caused by the breach" (*ibid.*; fn. omitted), *Becker* then proceeded to discuss strict liability in tort for injuries due to the defective condition of demised premises. The court pointed out that even before *Greenman* v. *Yuba Power Products, Inc., supra,* 59 Cal.2d 57, wherein California adopted the strict liability in tort theory, cases involving furnished apartments had applied a warranty doctrine to fasten liability on the landlord for supplying defective furnishings which caused injury. (*Becker, supra,* 38 Cal.3d at p. 463; see, e.g., *Hunter* v. *Freeman* (1951) 105 Cal.App.2d 129 [233 P.2d 65]; *Charleville* v. *Metropolitan Trust Co.* (1934) 136 Cal.App. 349, 355 [29 P.2d 241]; *Fisher* v. *Pennington* (1931) 116 Cal.App. 248, 249-251 [2 P.2d 518].) Similarly, two post-*Greenman* cases, *Fakhoury* v. *Magner* (1972) 25 Cal.App.3d 58 [101 Cal.Rptr. 473], and *Golden* v. *Conway* (1976) 55 Cal.App.3d 948 [128 Cal.Rptr. 69], had applied strict liability in tort to fasten liability on a landlord for equipping the premises with defective furnishings or appliances.[3]

---

[3]Although *Golden* noted it was not resting its decision on the fact that the premises were designed to be lived in and were being lived in by the tenant's employee, both the majority and concurring opinions in *Becker* (the latter of which was written by the court that decided *Golden*) treated *Golden* as if it involved merely a commercial lease of residential property. They basically relied on it as an example of an extension of the holding in *Fakhoury* of strict liability for defective furnishings in a furnished apartment to include strict liability for defective appliances in an apartment which are installed and thereby become defective fixtures.

■

### *Inapplicability of Becker to Commercial Rental Properties*

The holding in *Becker,* in essence, established a cause of action against a residential landlord for strict liability in tort based upon the breach of the implied warranty of habitability.  ■ ■ ■ ■ ■  In an attempt to put teeth into the implied warranty of habitability and the analogous housing codes, *Becker* responded to the query posed, earlier in the opinion, as to the extent of tort remedies for such a breach by adding a new tort theory of strict liability to the intentional and negligent tort remedies that the courts of appeal had already provided the residential tenant.[4]

The policy consideration underlying the rationale of the *Becker* decision, like the rationale of the *Green* decision establishing the breach of the nonwaivable implied warranty of habitability and the analogous nonwaivable statutory provisions, is the need to insure safe, adequate housing for modern, urban residential tenants who, like ordinary consumers, are powerless to protect themselves. The responsibility is therefore placed on the landlord who is in a better position to bear the business costs.[5]

---

[4]Examples of some of these already existing tort remedies are causes of action for intentional tortious breach of warranty of habitability, negligent failure to keep premises habitable, negligent violation of statutory duty, negligent or intentional nuisance, and intentional infliction of mental distress. (See *Stoiber* v. *Honeychuck* (1980) 101 Cal.App.3d 903 [162 Cal.Rptr. 194]; see also *Smith* v. *David* (1981) 120 Cal.App.3d 101, 112, fn. 3 [176 Cal.Rptr. 112]; Cal. Residential Landlord-Tenant Practice, *supra,* §§ 3.39, 3.41; pp. 164-165, 166-167.) These are in addition to the defense to an unlawful detainer action on grounds of breach of warranty and contractual actions for damages. The contractual breach of warranty and various tort theories are alternative remedies and of course cannot be used to give double recovery. (*Ibid.*)

[5]Thus, in justifying the application of the strict liability in tort doctrine to the case therein, the *Becker* court stressed the tenant's reliance on implied warranties that the premises were fit for use as a dwelling because the tenant was in no position to inspect a complex modern apartment building or to bear the expense to repair while the landlord in such a residential setting was in a better position to bear the business costs for the defects by insurance or otherwise.

In *Green, supra,* 10 Cal.3d at page 627, the Supreme Court observed: "In most significant respects, the modern urban tenant is in the same position as any other normal consumer of goods. [Citation.] Through a residential lease, a tenant seeks to purchase 'housing' from his landlord for a specified period of time. The landlord 'sells' housing, enjoying a much greater opportunity, incentive and capacity than a tenant to inspect and maintain the condition of his apartment building. A tenant may reasonably expect that the product he is purchasing is fit for the purpose for which it is obtained, that is, a living unit. Moreover, since a lease contract specifies a designated period of time during which the tenant has a right to inhabit the premises, the tenant may legitimately expect that the premises will be fit for such habitation for the duration of the term of the lease. It is just such reasonable expectations of consumers which the modern 'implied warranty' decisions endow with formal, legal protection."

Our Supreme Court further stressed that modern apartment buildings are complex, difficult and expensive to repair with adequate inspection by tenants being a virtual impossibility,

Although the *Becker* court's holding was an extension of the law of strict liability, it had been forecast by commentators as a logical step in view of the extension of the doctrine of strict liability to builders/sellers of mass-produced homes with implied warranties of fitness, and the *Green* doctrine of the implied warranty of habitability applied to residential lessors.

For example, Miller and Starr predicted the *Becker* court's holding that strict liability in tort applies to commercial lessors of residential property. In 1977, those commentators pointed out that "[a]lthough there has been an expansion of the duty owed by a landlord to persons on the premises, and thus an enlargement of negligence liability for persons who are injured on the premises, there is also a strong probability that he may be *strictly liable* in tort to all persons injured regardless of his negligence. The application of the doctrine of strict liability to a lessor of residential premises is a natural and logical extension of the present judicial development of the tort." (4 Miller & Starr, Cal. Real Estate (1977) § 27:77, p. 380, italics in original.)

But, at the same time, they also implicitly rejected any such extension to a lessor of commercial premises. They pointed out that "[t]here is no reason to extend the common law implied warranty of habitability to non-residential premises. This warranty resulted from the necessity of protecting the health and safety of residential tenants who need adequate housing in a marketplace where satisfactory housing is difficult to locate and the tenant is unable to protect himself because of his lack of knowledge, ability and bargaining position. These factors are not present in the leasing of nonresidential premises where the tenant is more sophisticated, his bargaining position is more equal to that of the landlord and, in the usual case, the contents of the lease, including the obligation of maintenance, are negotiated between the parties. [Fns. omitted.]" (4 Miller & Starr, *supra,* § 27:75, pp. 364-365.)

We agree. Just because California courts have found it "appropriate" to extend strict liability in tort to commercial lessors, as well as builders/sellers, of residential real property does not persuade us it would be appropriate to apply strict liability in tort to lessors of commercial and industrial real property.

---

and that repairs are often outside the reach of a tenant's ability or finances. Also, the scarcity of adequate low or moderate cost housing has left tenants with little bargaining power, while the widespread enactment of comprehensive housing codes shows that public policy compels landlords to bear the primary responsibility for maintaining safe, clean and habitable housing in our state. (*Id.,* at pp. 623-627; see also *Knight* v. *Hallsthammar, supra,* 29 Cal.3d 46, expanding the use of the implied warranty of habitability as a defense in an unlawful detainer proceeding.)

Housing is an entirely different type of real estate activity. For example, the principle of strict liability in tort for builders/developers of new housing construction has been well-established in this state for several years. (See, e.g., *Kriegler* v. *Eichler Homes, Inc., supra,* 269 Cal.App.2d 224 [mass-produced homes with defectively installed heating system]; *Avner* v. *Longridge Estates, supra,* 272 Cal.App.2d 607 [111 Cal.Rptr. 262] [unstable fill of residential lot]; *Hyman* v. *Gordon* (1973) 35 Cal.App.3d 769 [defective design in placement of water heater in homes]; *Stuart* v. *Crestview Mut. Water Co.* (1973) 34 Cal.App.3d 802 [110 Cal.Rptr. 543] [defective design of water system for homes]; *Del Mar Beach Club Owners Assn.* v. *Imperial Contracting Co.* (1981) 123 Cal.App.3d 898 [176 Cal.Rptr. 886, 25 A.L.R.4th 336] [defective multiple-unit residential-development complex on unstable bluff location].) Yet our research has uncovered no cases applying strict liability in tort to builders, developers or subdividers of large-scale commercial or industrial projects.

The analysis in *Green* and *Becker* of the realities of the modern residential market with its need for enforcing an implied warranty of habitability does not necessarily apply to the commercial-industrial rental market. Housing has unique policy implications. Although public policy embodied in the widespread enactment of comprehensive housing codes compels landlords to bear primary responsibility for maintaining safe, clean and habitable housing (see *Green, supra,* 10 Cal.3d at p. 627; see also Comment, *Landlord Tort Liability in California: Are the Restrictive Common Law Doctrines on Their Way Out?, supra,* 12 San Diego L.Rev. 401, 411), we know of no equivalent policy with respect to commercial buildings.

■ Furthermore, a commercial tenant cannot raise an implied warranty of habitability defense in an unlawful detainer proceeding. (*Schulman* v. *Vera* (1980) 108 Cal.App.3d 552 [166 Cal.Rptr. 620].) ■ Moreover, while residential tenants additionally need protection because of the legislatively recognized severe housing shortage in the state (see, e.g., Health & Saf. Code, § 33250; *Green, supra,* 10 Cal.3d at p. 625, fn. 8; *Smith* v. *David, supra,* 120 Cal.App.3d at p. 111), there is no scarcity of commercial property. Also, unlike residential tenants, but like landlords, commercial tenants can absorb the costs as a business expense.

In summary, we conclude that *Becker* was intended to be restricted to landlords of residential property. There is no public policy rationale warranting the extension of *Becker* beyond its obvious intent. ■ ■ ■ ■ Accordingly, the trial court properly sustained the demurrer without leave to amend to petitioner's second cause of action.[6]

---

[6]Petitioner is not left stranded without any means of obtaining compensation for her injuries. Petitioner has stated a cause of action in negligence against the landlord who has a duty of due care under Civil Code section 1714. She apparently may also seek workers' compensation benefits from the tenant, her employer.

The alternative writ is discharged and the petition is denied.

Lillie, P. J., and Johnson, J., concurred.