[Civ. No. 4302. Fifth Dist. Mar. 23, 1981.]

**KENNETH SMITH et al., Plaintiffs and Appellants, v. EDWARD C. DAVID, Defendant and Respondent.**

COUNSEL

William C. Kennedy and William C. McNeill III for Plaintiffs and Appellants.

Brunn, Lacey & Thayer and Thomas A. Lacey for Defendant and Respondent.

OPINION

**FRANSON, Acting P. J.**—We review a defense judgment following jury trial where plaintiff tenants sought to recover compensatory and punitive damages for (1) the defendant landlord's alleged breach of a warranty of habitability of a rented building; (2) the intentional infliction of emotional distress; and (3) the maintenance of a nuisance. The jury returned special verdicts finding for the defendant landlord on all three causes of action.

Plaintiffs contend the judgment must be reversed because of instructional errors relating to the causes of action for breach of warranty and for nuisance. We agree. Plaintiffs also contend the trial court should have entered a directed verdict in their favor on the nuisance cause of action. We disagree.

THE EVIDENCE

The plaintiffs in this action are Kenneth Smith, a 50-year-old disabled shoemaker, his wife Tommie Jean who is also disabled, and their daughter, Evelyn. The family survived on a disability pension of $294 a month and meager amounts the family members were able to earn in part-time work.

The evidence portrayed the difficult situation this family faced in finding affordable housing. In December 1976, they were forced to leave their previous residence; numerous attempts to locate housing were unsuccessful. The Smiths noticed that the residence at 2000 Tucson Road was empty, so they approached the defendant who owned the property and explained that they needed a place to live. Defendant agreed that the Smiths could live in one of the units at 2000 Tucson Road for $150 per month.

The Smiths knew the condition of the subject premises was quite bad when they agreed to rent the unit: the walls were covered with grafitti, the floor tiles were broken, the back door was broken, and the bedrooms had no interior doors. However, Mr. Smith said he took the apartment because the defendant indicated he would have someone fix the place up within two or three weeks. Smith testified the defendant promised he would repair the walls, doors and broken windows. The Smiths agreed to do some painting if defendant supplied the materials; however, Mr.

Smith said he did not agree to do the other repairs, except that he would give some minor assistance if needed.

The Smiths moved into the subject premises on December 15, 1976. Mr. and Mrs. Smith testified that most of the repairs promised by the defendant never materialized. The defendant had made arrangements with a Mr. Ray Felton and later with a Mr. Jerry Selfridge to have the apartment renovated. However, for various reasons the renovation was never accomplished. Mr. Felton never completed the work on the apartment units because he had a disagreement with the defendant. Felton abandoned the renovation project shortly after the Smith family moved in.

Jerry Selfridge and his brother were then hired by the defendant to bring the apartment dwelling "up to Code." The Selfridges were to fix the floor, do plumbing and electrical work, erect sheetrock and repair the wall surfaces. Although Mr. Selfridge went to the premises three or four times, the only work he completed was to hang several doors in the bedrooms. Mr. Selfridge finally abandoned the project because he did not have enough time and it was too difficult to accomplish the work while the Smith family was living in the apartment.

Various public officials inspected the premises during the Smiths' occupancy. These inspections revealed little progress with the needed renovations and disclosed numerous housing code violations. The apartment units in the building had previously been posted as unsafe, and the necessary releases had not been secured before the Smiths moved in.

Mr. Robert Azevedo, a senior sanitarian with the Stanislaus County Health Department, testified as to his observations during an inspection of the apartment unit in November 1977, towards the end of the Smiths' occupancy. Azevedo testified that there were numerous housing code violations, including: lack of taping and texturing of walls, deficient electrical wiring, lack of floor coverings over bare wood, inoperable light fixtures, unfinished interior door frame to the front bedroom, deteriorated window sills, no locking device on the front window, leaking faucet, improperly secured toilet bowl and tank, leaking toilet tank, deteriorated metal shower stall, deteriorated cabinet under the kitchen sink, leaking water connection under the kitchen sink, inadequate water heater, inadequate room heater, exposed unsecured electrical outlets in the laundry room, and unfinished exterior walls and window frames lacking weather protection.

Azevedo testified that, in his opinion as a registered sanitarian, the building was "sub-standard." Azevedo also opined that some of the housing code violations presented a risk to the health and safety of the occupants; he mentioned specifically the electrical wiring, the leaking plumbing, and the absence of locking devices.

Members of the Smith family testified as to additional problems with the apartment. Mrs. Smith mentioned the presence of bugs and animals in the house; however, there was evidence that some of these problems may have been due to the Smiths' own poor housekeeping habits. Other problems with the apartment were unrelated to poor housekeeping. For example, Mrs. Smith mentioned that the heating and insulation were so inadequate the family had to wear sweaters and jackets inside the house and their health was adversely affected. The family members suffered more colds and respiratory problems than normal that year. Mrs. Smith also testified that some of the electrical wiring and plugs were so bad that every time she plugged something in she was shocked. She also mentioned that due to the absence of operable electrical outlets in the bedrooms, the family had to drape extension cords through the bathroom, over the sink, and into the bedroom; Mrs. Smith was concerned about this dangerous arrangement. She also explained that the plumbing in the bathroom leaked so that the floors were constantly damp, despite her efforts to mop up every time the toilet was used. She thought this increased the danger from the electrical problems and was fearful about this.

During the Smiths' tenancy, they continually voiced complaints to the defendant regarding the conditions in the apartment. The defendant acknowledged at trial that he was aware of these complaints; however, he explained the difficulties he encountered in getting the work done by Felton and Selfridge. He suggested it was the Smiths' failure to cooperate which prevented the completion of the needed repairs. Defendant testified that Mr. Smith never helped Selfridge, as he was supposed to. Moreover, defendant said that the Smiths' belongings were in the way of the workmen.

During the Smiths' 12 1/2 months occupancy of the subject premises, they paid a total of only $400 rent, although the initial agreement had been for a monthly rental of $150. The first month the Smiths gave the defendant $150 as agreed. In January they paid only $100 and in February only $50. No rent was paid between March 1977 and June 1977. Mr. Smith said the reason why he did not pay rent was because the

place was condemned and he would not pay until the apartment was fixed up. In June, the Smiths paid defendant $100. Mr. Smith explained that the reason he made this payment was because the defendant had promised to install a bathtub. Defendant testified that the reason Smith paid the $100 in June was because he had threatened to evict the Smiths so the renovation project could proceed. After June 1977, the Smiths paid no rent.

In July 1977, Mr. Smith spoke with an attorney; the instant action was filed the following month. The defendant thereafter filed an unlawful detainer action. The Smiths finally moved from the premises at the end of 1977 pursuant to an agreement reached in the unlawful detainer action.

With respect to damages, the Smiths introduced evidence that they had suffered physical and emotional symptoms attributable to the condition of their apartment. A physician testified that various nervous ailments suffered by both Mr. and Mrs. Smith were accentuated during the time they lived in the apartment. Mr. Smith's nervous condition required prescriptions for tranquilizers and sleep medications and Mrs. Smith also required tranquilizers. Her symptoms included insomnia, crying spells, headaches, loss of memory, confusion, and stress incontinence. However, the Smiths' doctor testified that they had suffered many of these nervous ailments before they moved into the apartment in question.

PREJUDICIAL INSTRUCTIONAL ERRORS
RELATING TO THE CAUSE OF ACTION FOR
BREACH OF WARRANTY OF HABITABILITY

Plaintiffs contend the trial court improperly refused to give several requested jury instructions which stated correct principles of law and which were warranted by the evidence. ■ First, plaintiffs argue that the trial court erroneously refused to give their proposed instructions which attempted to clarify the relationship between housing code violations and the breach of warranty of habitability.[1]

---

[1] The trial court instructed that "habitable" premises are those which are fit for human occupation. It refused to amplify this definition by instructing that "habitable" means the premises are in compliance with state and local housing and building codes. The trial court also refused to give a proposed instruction which provided that a landlord's warranty of habitability involves a promise "to obey applicable housing and health laws" in the renting and maintenance of the property. Another instruction was

In *Green* v. *Superior Court* (1974) 10 Cal.3d 616 [111 Cal.Rptr. 704, 517 P.2d 1168], at pages 637-638, the Supreme Court pointed out that housing code violations are important to a determination whether the warranty of habitability has been breached. "This implied warranty of habitability does not require that a landlord ensure that leased premises are in perfect, aesthetically pleasing condition, but it does mean that 'bare living requirements' must be maintained. *In most cases substantial compliance with those applicable building and housing code standards which materially affect health and safety will suffice to meet the landlord's obligations under the common law implied warranty of habitability we now recognize.* As the *Hinson* court observed: '[m]inor housing code violations standing alone which do not affect habitability must be considered *de minimus* and will not entitle the tenant to reduction in rent . . . .'" (Fns. omitted, italics added.)

Pursuant to *Green, supra*, a proper instruction on the relationship between the housing codes and the implied warranty of habitability would have told the jury that the landlord's failure to *substantially* comply with applicable building and housing code standards which materially affect health and safety would constitute a breach of the warranty of habitability. (*Id.*, at p. 637; see also *Knight* v. *Hallsthammar* (1981) 29 Cal.3d 46, 59, fn. 10 [171 Cal.Rptr. 707, 623 P.2d 268].) Although appellants' requested instructions failed to point out that minor violations would not constitute a breach of the warranty of habitability, nevertheless, because of the extreme importance of the housing code violations to plaintiffs' cause of action for breach of warranty, we are persuaded that the trial court should have assisted in a modification of the proffered instructions.

That the jury needed guidance in this area is demonstrated by its request to the court during its deliberations: "Please define 'bare living requirements.'"[2] The only answer given by the court to the jury's question was: "I do not have a definition of 'bare living requirements.' You will have to decide that for yourselves."

The original wording of the jury's question suggests it was having difficulty understanding the effect of housing code violations on the

refused which provided that the landlord, by renting to the plaintiffs, has covenanted "to obey the health and housing laws of the State of California, County of Stanislaus, in the maintenance and renting of his property."

[2]This question was originally phrased as "Does 'bare living requirements' mean the same thing as housing code requirements?" The clerk's transcript shows that the foregoing words were scratched out, when the jury's question was reworded.

question whether the implied warranty of habitability had been breached. Because the jury had indicated its confusion and because minor modifications in the proffered instructions would have rendered them serviceable, the trial court had a duty to make the modifications and give the jury proper instructions on this subject. (See *Roberts v. City of Los Angeles* (1980) 109 Cal.App.3d 625, 632-634 [167 Cal.Rptr. 320]; *Trejo v. Maciel* (1966) 239 Cal.App.2d 487, 498 [48 Cal.Rptr. 765]; see also 4 Witkin, Cal. Procedure (2d ed. 1971) §§ 195, 199, pp. 3014-3015, 3017.) As noted in the *Trejo* case: "The responsibility for adequate instruction becomes particularly acute when the jury asks specific guidance." (239 Cal.App.2d at p. 498.)

■ Plaintiffs next contend the trial court should have instructed the jury that premises may still violate the warranty of habitability even if the tenants remain living there. Proposed instruction No. 35 would have told the jury: "[The] fact that plaintiffs remained in premises which they claim were uninhabitable does not mean, under the law, that the premises were therefore habitable." This is a correct statement of the law and was necessary to the jury's understanding of the doctrine of habitability. (See *Green* v. *Superior Court, supra,* 10 Cal.3d at pp. 625-626, fn. 10; see also *Knight* v. *Hallsthammar, supra,* 29 Cal.3d 46, 51-54, where the Supreme Court specifically announced that a tenant's lack of knowledge of defects in the premises is not a prerequisite to the landlord's breach of the warranty; a tenant who continues to live in uninhabitable premises after learning of the defects does not thereby waive the implied warranty of habitability.)

The trial court also refused an instruction which would have told the jury that tenants are relieved from their obligation to pay rent if the landlord does not substantially comply with the applicable health and housing laws (plaintiffs' proposed instruction No. 30). This instruction, however, is not entirely correct. ■ A tenant is not relieved from the total obligation to pay rent if a landlord does not substantially comply with the applicable health and housing laws; the tenant may withhold payment of the rent until the defects are remedied or until there is a judicial determination as to the fair rent owing to the landlord for the premises in its substandard condition. (See *Green, supra,* 10 Cal.3d at p. 629; *Hinson* v. *Delis* (1972) 26 Cal.App.3d 62 [102 Cal.Rptr. 661].) As stated in *Hinson* at page 70: "the tenant is not absolved from all liability for rent, but remains liable for the reasonable rental value of the premises, as determined by the trial court, for such time as the premises were in violation of the housing codes."

█ Plaintiffs also contend the trial court erred by failing to give proposed instructions No. 33 and 34 which paraphrase the legislative findings of Health and Safety Code sections 33250. These instructions would have advised the jury of the serious housing shortage prevailing in the State of California. The California Supreme Court took judicial notice of this statute in *Green, supra,* 10 Cal.3d at page 625, footnote 8, and appellants argue that the trial court in the present case should have judicially noticed this section and should have given the requested jury instructions. Such instructions might have assisted the jury in understanding why tenants would remain in a dwelling which was essentially uninhabitable rather than finding a better place. Although not crucial to plaintiffs' case, we conclude that one of these instructions would have been appropriate because it would have assisted the jury in comprehending the issues. (See also *Knight* v. *Hallsthammar, supra,* 29 Cal.3d at pp. 52-53, fn. 3.)

█ The question remains whether the instructional errors were prejudicial so as to compel a reversal on the breach of warranty cause of action. An argument can be made that even if the jurors had been more fully instructed on the warranty of habitability and had found that the warranty was in fact breached, there is no reasonable probability plaintiffs would have recovered compensatory damages. The evidence showed that appellants paid only $400 rent for the 12 1/2-month period they lived on the subject premises. This amounts to less than $40 per month rent. The monthly rental agreed to was $150. This evidence might suggest that plaintiffs legitimately should not be awarded compensatory damages because they have already been adequately compensated for the inconvenience they suffered as a result of the poor condition of the apartment. However, we believe that the jury could reasonably find, under the circumstances of this case, that plaintiffs were entitled to compensatory damages.

*Green* v. *Superior Court, supra,* suggests an appropriate measure of damages for a breach of warranty of habitability may be the difference between the fair rental value of the premises if they had been as warranted and the fair rental value of the premises as they were during occupancy by the tenants in the unsafe or unsanitary condition. (10 Cal.3d at p. 638.) Another method of computation includes a "percentage reduction of use" approach under which the tenant's rental obligation is reduced by a percentage corresponding to the relative reduction of use of the leased premises caused by the landlord's breach.

(*Id.*, at p. 639, fn. 24; see also Moskovitz, Cal. Eviction Defense Manual (Cont.Ed.Bar Supp. 1980) § 9A.15, pp. 67-71; and see Note, *The Great Green Hope: The Implied Warranty of Habitability In Practice* (1976) 28 Stan.L.Rev. 729, 759-761; Moskovitz, *The Implied Warranty of Habitability: A New Doctrine Raising New Issues* (1974) 62 Cal. L.Rev. 1444, 1487-1488.)

*Quevedo* v. *Braga* (1977) 72 Cal.App.3d Supp. 1 [140 Cal.Rptr. 143], holds that damages under a cause of action for breach of warranty of habitability are limited to a refund of the amount which reflects the *difference between the rent paid* during the duration of the unfit condition *and the rent which would have been reasonable*, taking into account the extent to which the rental value of the property was reduced by virtue of the defective condition. (72 Cal.App.3d Supp. at p. 8.)[3]

However, we cannot conclude as a matter of law that $400 rent for a year's occupancy was a reasonable rent for the premises in their defective condition. Indeed, *Green* mentions the possibility that the landlord's breach may be *total* to the point that the tenant may owe no rent at all (10 Cal.3d at p. 639).

For the reasons stated, we conclude it is reasonably probable that the jury would have found the defendant had breached the implied warranty of habitability if it had been instructed that the landlord must substantially comply with building and housing code sections which materially affect the tenant's health and safety. This being so, it became a jury question as to whether plaintiffs suffered damages as a result of the breach of warranty above and beyond the amount of rent they have already withheld.

PREJUDICIAL INSTRUCTIONAL ERROR
ON THE NUISANCE CAUSE OF ACTION

Plaintiffs next contend that the trial court erred by refusing to give several jury instructions relating to their cause of action for nuisance.

---

[3]Appellants also pleaded facts in the fourth cause of action showing a tortious breach of the warranty of habitability based on respondent's alleged intentional, malicious and outrageous conduct. Hence, upon proof at retrial, appellants may seek general and punitive damages for the alleged tortious breach of warranty (*Jones* v. *Kelly* (1929) 208 Cal. 251 [280 P. 942]; *Stoiber* v. *Honeychuck* (1980) 101 Cal.App.3d 903 [162 Cal.Rptr. 194]; cf. *Quevedo* v. *Braga, supra,* 72 Cal.App.3d Supp. 1).

The court refused the following instructions: "Any building or portion thereof which has become substandard is a nuisance. [¶] A building is substandard when there exists in that building, or in any portion of it, violations of the Uniform Housing Code, which endanger life, limb, health, property, safety or welfare of the public or the occupants."

"If you find that the dwelling at 2000 Tucson Avenue was substandard as previously defined, then you must find that the dwelling located at 2000 Tucson Avenue constituted a nuisance."

The court did instruct the jury on the general definition of nuisance, as set forth in Civil Code section 3479.[4] The jury was also instructed that if the dwelling in question was found to constitute a nuisance, the jury could award damages to plaintiffs only if it found that the nuisance was "specially injurious to them, as opposed to the community in general." ■ However, plaintiffs contend they were prejudiced by the court's failure to instruct on their alternative theory of establishing a nuisance as a matter of law under pertinent provisions of the California Administrative Code.

Section 122 of title 25 of the Administrative Code provides that: "Any building or portion thereof, which has become substandard, as defined herein, is hereby declared to be a nuisance." A substandard building is defined in section 116 as follows: "For the purposes of this article a substandard building shall be as defined in Section 17920(f) of the Health and Safety Code which reads as follows: ... 'Substandard building' means any building or any portion of a building including, but not limited to, any dwelling unit, guest room, or suite of rooms, or the premises on which the same is located, *in which there exist any of the conditions listed in Chapter 10 of the Uniform Housing Code, latest edition, ... to an extent that endangers the life, limb, health, property, safety, or welfare of the public or the occupants thereof.*" (Italics added.)

Under the Administrative Code sections just quoted, buildings which meet the definition of "substandard" are public nuisances per se which may be enjoined by appropriate procedures. (See 7 Witkin, Summary of Cal. Law (8th ed. 1974) Equity, §§ 99-100, pp. 5320-5322; *City of Bakersfield* v. *Miller* (1966) 64 Cal.2d 93, 99-101 [48 Cal.Rptr. 889, 410 P.2d 393].) Although such a building would constitute a *public*

---

[4]Civil Code section 3479 provides: "Anything which is injurious to health, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, ... is a nuisance."

nuisance, a private citizen may have a right of action based on such a nuisance if he shows special injury different in kind from that suffered by the general public (*Venuto v. Owens-Corning Fiberglas Corp.* (1971) 22 Cal.App.3d 116, 124 [99 Cal.Rptr. 350]; 7 Witkin, Summary of Cal. Law, *supra*, § 104, pp. 5324-5325).

Plaintiffs' requested instruction correctly states the law and should have been given. There was evidence to support a finding that plaintiffs suffered special injuries different from that suffered by the public in general—they offered proof of emotional and physical symptoms resulting from (or at least worsened by) the condition of their apartment. There was also evidence of numerous housing code violations. Mr. Azevedo testified that some of these violations affected the health and safety of the residents. Additionally, he opined that the dwelling in question was "sub-standard."

Had the jury been given the instructions in question, there is a strong probability they would have found the dwelling was substandard and consequently a nuisance. If the jury determined that the housing code violations in the dwelling "endangered the life, limb, health, property, safety or welfare ... of the occupants thereof," then the jury would have to find that the building was a nuisance. Thus the failure to give the instructions was prejudicial error. (Cf. *Knight v. Hallsthammar, supra*, 29 Cal.3d 46, 59.)

Plaintiffs also contend the trial court should have given their proposed instruction No. 26 which provided: "If you [find that] any one of the plaintiffs had *any fear* or apprehension of injury from any dangerous condition existing at 2000 Tucson Avenue, which interfered with their comfortabel [*sic*] enjoyment of the dwelling, *you must find* that the dwelling constituted a nuisance." (Italics added.) The trial court properly refused this instruction because it requires the jury to find a nuisance that the tenants had "*any* fear." ▪ A de minimis interference with the enjoyment of land does not constitute a nuisance. Moreover, this instruction has many of the vices of a "formula" instruction (see 4 Witkin, Cal. Procedure (2d ed. 1971) Trial, § 212, p. 3029).

### THE TRIAL COURT PROPERLY DENIED PLAINTIFFS' MOTION FOR A DIRECTED VERDICT ON THE NUISANCE CAUSE OF ACTION

▪ Appellants finally contend the trial court should have directed a verdict in their favor on the nuisance cause of action because the evi-

dence was uncontroverted that there were numerous housing code violations, and this evidence established a nuisance as a matter of law, as discussed previously. While the evidence of housing code violations may have been uncontradicted, appellants overlook the fact that housing code violations only make a building "substandard" within the meaning of the pertinent administrative code provisions when the violations are "to an extent that endangers the life, limb, health, property, safety, or welfare of the public or the occupants thereof." Therefore, the jury would have to determine the factual question whether the housing code violations were sufficiently dangerous to render the building substandard. Moreover, a jury question would remain as to whether appellants suffered special injuries giving them a right to maintain a private action based on this public nuisance. Finally, jury questions would remain as to whether appellants' illnesses and mental distress were caused by the condition of the building. We conclude there is sufficient evidence to support a factual determination in favor of the defendant on these questions; therefore, the trial court properly denied a directed verdict on the nuisance cause of action. (See generally, *Estate of Lances* (1932) 216 Cal. 397, 400-401 [14 P.2d 768].)

The judgment is reversed.

Hanson (P. D.), J., and Lauritzen, J.,* concurred.

A petition for a rehearing was denied April 16, 1981.

---

*Assigned by the Chairperson of the Judicial Council.