Filed 3/17/14  Grabowiec v. Schopmeyer CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| BOGDAN GRABOWIEC, | |
| Plaintiff and Respondent, | G047312 |
| v. | (Super. Ct. No. 30-2008-00113641) |
| ROBERT SCHOPMEYER, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Thierry Patrick Colaw, Judge.  Affirmed as modified.

Bruce C. Janke for Defendant and Appellant.

ASG Samini Law Group LLP, Bobby Samini and Randal Whitecotton for Plaintiff and Respondent.

Robert Schopmeyer appeals from a judgment following a bench trial in favor of his former tenant, Bogdan Grabowiec. The trial court awarded Grabowiec $45,700 in combined damages due to Schopmeyer's breach of the implied warranty of habitability implied into the residential lease and his wrongful retention of the security deposit. Schopmeyer contends the evidence is insufficient to support the finding he breached the warranty of habitability. We agree and modify the judgment by striking the damages relating to that cause of action. The judgment is affirmed as modified.

FACTS AND PROCEDURE

In 2008, Grabowiec, his wife, and his children moved from Poland to California. Grabowiec was an engineer. His wife has degrees in engineering and psychology and was working on her Ph.D. Grabowiec came to California alone in May 2008 to find a suitable residence.

Grabowiec contacted Jennifer Falconer at Century 21 to show him potential houses to lease. Because Grabowiec did not speak English, he brought a friend with him to translate when he met with Falconer. Although Grabowiec testified he did not know whose agent Falconer was in the transaction, the lease states she was his agent and Grabowiec's wife testified Falconer was their agent.

The subject property, an approximately 3,000 square foot house in a gated community in Newport Beach, was one of several Falconer showed Grabowiec. It was owned by Schopmeyer, who resided in Northern California. Schopmeyer bought the house new in 1997, and it was always a rental property. The tenant just before Grabowiec was there for one year, and the tenant before that lived in the house for five or six years. Jerry Thompson was Schopmeyer's leasing agent.

When Falconer showed Grabowiec and his friend the property on May 13, 2008, they walked through the house and the garage. Grabowiec testified he told Falconer his daughter had asthma and therefore the clean condition of the house was crucial. Falconer told him the house would be in "spic and span" condition. Falconer

2

denied those statements were made. Falconer testified she told Grabowiec the house and carpet would be cleaned, but she made no representations that an extraordinary level of cleanliness would be achieved. Falconer testified Grabowiec did not have any specific concerns and only asked if he could paint and plant flowers and he wanted the windows washed. There is no evidence Grabowiec's daughter's medical condition or the family's desire for extreme cleanliness was ever communicated to Schopmeyer or Thompson, or that either made any representations regarding the condition of the property to Grabowiec.

Grabowiec signed the residential lease for the subject property on May 14, 2008. The lease was for a one-year term beginning on July 2, 2008, at $5,800 a month rent. Because Grabowiec had no credit history in this country, he offered to pay one year of rent in advance, but Schopmeyer asked for only six months advance rent ($34,800), which Grabowiec paid, plus a $7,500 security deposit.

The lease agreement included two addenda that referred to mold. One stated: "Tenant is not relying upon, nor shall Tenant rely upon, the Landlord or real estate agents and Brokers, to conduct any investigations concerning the existence of any moisture or mold on or within the wallboards or on or within any other structure of the building. Tenant is exclusively relying upon Tenant's own investigation, and Tenant-obtained moisture/mold inspection reports, payable by Tenant, to locate the existence or cause of any moisture and/or mold." The other, titled, "Lease/Rental Mold and Ventilation Addendum" (Mold Addendum), stated: "Except as may be noted at the time of Tenant's move in inspection, Tenant agrees that the Premises is being delivered free of known damp or wet building materials ("mold") or mildew contamination . . . ." The Mold Addendum obligated the Tenant to properly maintain the house to inhibit mold growth and to notify Landlord of any significant mold growth.

After the prior tenant had moved out of the house, their live-in maid cleaned the house and Thompson had the carpets steam cleaned. Thompson inspected the

house after the prior tenants moved out and did not find any significant problems. He hired an electrician to fix a few problems with outlets and lights and had the backyard resodded. Falconer testified she found the property to be in reasonable condition and did not see anything unusual or any condition that would make it unsafe for human occupancy.

Grabowiec's wife arrived from Poland with the children on July 2, and when she saw the house immediately thought it was unsafe for her daughter because there were bird droppings on the front porch and it was dirty inside. The family stayed in a hotel for a few nights. Schopmeyer directed Thompson to hire someone to clean the house to the Grabowiecs' satisfaction. Thompson sent a professional cleaning crew over to clean the house. Grabowiec's wife and 16-year-old son also cleaned the house for the next few days and the family moved in on July 4 or 5. They filled out the move-in/move-out inspection form over the course of five days, which Grabowiec's wife signed on July 7 and delivered to Falconer. On the inspection form, Grabowiec's wife described virtually everything in every room in the house as being "filthy" or "dirty." She reported scratches on walls and baseboards, missing light bulbs, and missing or broken switches and wall sockets. Under the heading "Kitchen," she wrote on the "Oven(s)/microwave" line, "danger to operate." On the "Range/Fan/Hood" line, she wrote, "filthy, NOT WORKING." The dishwasher was "rusty" and faucets leaked. The inspection report made no mention of there being any mold in the house. Falconer forwarded the report to Thompson.

Over the next two weeks, Grabowiec's wife called Thompson and Falconer with various concerns. Those complaints included concerns about the gas stove, which will be discussed in more detail below. In response to those calls, Thompson hired a handyman to work with Grabowiec's wife to go over all the repairs she wanted done and to take care of them. The handyman testified he did everything Grabowiec's wife asked. When Grabowiec's wife complained to Thompson that the house still was not clean

4

enough for her family, Thompson hired a second professional cleaning crew to clean the house again. He also had the outside of the windows washed and the exterior of the house pressure washed. Thompson testified he never refused any of Grabowiec's wife's repair or cleaning requests. Although her requests were not unreasonable, Thompson eventually concluded Grabowiec's wife would never be satisfied. Falconer testified that every time she thought Grabowiec's wife's concerns had been addressed, she would call with another problem.

In the second week of July, Schopmeyer telephoned Grabowiec's wife and asked her what the continued problems were. He made an appointment to meet with her at the house and flew down from Northern California. When he arrived, Grabowiec's wife was not home, but her 16-year-old son was there. Grabowiec's wife testified Schopmeyer had only given her an approximate time for his visit and she was at the grocery store. As she was returning home, she saw Schopmeyer driving out the development's front gate, but he did not wait for her.

Schopmeyer and Grabowiec's 16-year-old son went through the house. Schopmeyer believed it was in immaculate condition—it looked like a brand new house with two exceptions: an interior garage wall had some scrapes and needed repainting and there was a doorstop missing. Grabowiec's son said everything was perfect and said nothing about mold or problems with the stove. Schopmeyer thought all the cleaning and repair issues raised by the Grabowiecs had been addressed. He left the Grabowiecs his direct office phone number but did not hear anything from them until July 28.

On July 28, the water heater in the garage began leaking. Grabowiec's wife faxed a letter to Thompson telling him about the leak and she said the dishwasher did not work. The Grabowiecs went to Falconer's office and announced they were moving out and wanted their rent money back. Falconer told them they needed to notify Schopmeyer of the water heater leak right away, which they did. Schopmeyer told the Grabowiecs he would pay for a hotel room until a new water heater could be installed. The new water

heater was installed the next day, July 29. The Grabowiecs told Falconer they were moving out because of the burst water heater, the malfunctioning stove, painting and yard work that had not been finished, a burned out exterior light, and the house still was not clean enough for them. They did not mention mold or their daughter's health concerns to Falconer.

The Grabowiecs moved out of the property on August 7. A few days before moving out, Grabowiec's attorney mailed a letter to Schopmeyer, care of Thompson, detailing their complaints about the house, giving notice of rescission of the lease agreement, and demanding their rent monies and security deposit be refunded. Thompson did not transmit the letter to Schopmeyer. A few days later, Thompson learned the Grabowiecs had left the house. They did not provide him with a forwarding address or the keys. When Thompson went to the house, he saw the new sod that had been installed in the backyard was dead. The instant action was commenced by Grabowiec in October 2008.

Grabowiec's wife testified at trial to the problems she found in the house when she moved in. She testified there were some insects and cockroaches, a clogged toilet, light switches and electric outlets that were damaged or lacked covers, dirty air vents, the windows were dirty and there were leaves and dirt in the window tracks, one window would not close properly, there were crumbs and some food particles left in kitchen cabinets, the microwave oven only worked on the popcorn function, some telephone cables had been cut, and in the backyard there was a unidentified cable torn out and a loose wire. She took photographs of the problem areas, and they were admitted into evidence. The photographs depicted: a capped but exposed electrical wire or cable inside a cabinet; an exposed electrical wire outside; leaves and dirt in the tracks of some downstairs windows; one dead bug under the kitchen sink; some small spots or blemishes on a few walls; dirt or crumbs inside some kitchen cabinets; water running down the driveway apparently after the water heater burst; three cable or electrical outlets on which

6

the cover was loose; two air vents with dirt on them; and a spot of bird droppings by a pillar on the front porch.

Of particular concern to Grabowiec and his wife were problems with mold and the kitchen stove. Grabowiec's wife's testified there was mold in the house—specifically on the back wall of the cabinet under the kitchen sink and in the garage on the wall behind the water heater. She testified there was a small leak in the kitchen faucet. She made no mention of mold on the inspection report she had filled out, but she knew it was mold because she had a background in toxicology. Grabowiec's wife felt the presence of mold made the house dangerous for her daughter who had asthma. Grabowiec presented photographs of the interior of a few kitchen cabinets with some blackish splattering on the back, and a photograph of the wall in the garage behind the water heater with some spots Grabowiec's wife believed was mold.

Schopmeyer testified that when he learned about the claim of mold and saw the Grabowiec's photographs (after this litigation commenced), he inspected the kitchen cabinets. The black splattering shown in the photographs was paint, not mold. Schopmeyer testified he had a mold inspection done on the house, which included taking air samples, and there was no mold in the house. Schopmeyer could not identify the photographs Grabowiec's wife testified depicted mold found on the wall of the garage behind the water heater. He denied ever seeing the spots shown on the photographs or ever seeing any mold in the garage. He agreed the water heater had been leaking and splashed water on the wall. When the water heater was replaced, if there had been mold there, it was most likely cleaned up at that time and the garage was then repainted.

Grabowiec's wife also testified the gas stove in the kitchen did not work properly. The stove had five burners. She testified "two or three or more" burners did not light properly because "I had the fire few seconds and after I heard like push, push, push and the fire was gone and I saw just gas." The stove "didn't work" and therefore she could not use it for cooking. Grabowiec testified he considered the stove was

7

dangerous due to gas leakage and because "flame and gas[] . . . in and of itself, that combination is dangerous." He did not know if there was in fact a gas leak in the stove. Later, he said he tested all the burners and that none of them "worked correctly." Grabowiec's wife called Falconer to complain about the stove, and Falconer told her to call the gas company. The gas company came to check the stove, but found no issue with the gas—it was the stove.

Grabowiec's wife told Thompson there was a problem with the stove and when he checked it, he found the automatic igniter on two of the five burners did not ignite properly. Thompson asked the handyman to look at it. Around July 16, the handyman cleaned out the gas orifices on the burners, but when he could not get the burners to light properly, he referred the job to an appliance repair company. The handyman testified the stove was not leaking gas or dangerous, explaining, "The only problem with it as I recall is when you turn it on to ignite it and then go into the high position it wasn't igniting on its own. So you could simply turn the stove off if it was a hazard. There is a safety shutoff valve for the gas underneath the stove, which on all appliances in a house that run gas they have this shutoff. . . . It was not a hazard. Everybody knew it didn't work so don't touch it until it gets fixed."

Schopmeyer testified that when the handyman could not fix the stove, an appliance repair company was sent out. The technician reported the two back burners on the stove did not work properly, but the front three "worked just fine." However, because it was a "sealed unit" individual burners could not be replaced while leaving other burners in place, so the technician recommended a new range unit be installed. Schopmeyer testified they were in the process of getting the new stove top when the Grabowiecs moved out. Thompson testified the technician came out after the Grabowiecs vacated the house. The technician never suggested the stove was dangerous, it was just that the two burners did not work. The stove was replaced towards the end of August.

8

Grabowiec's wife testified the decision to move out was made due to the stove not working properly, the presence of mold, and only the popcorn function worked on the microwave. It was not because the house was still too dirty. Grabowiec testified they moved out because the house was dangerous because of the malfunctioning stove, mold, insects, and a window that would not close properly.

Schopmeyer testified he rerented the property effective November 1, 2008, for $5,000 per month. Schopmeyer testified he did not send the Grabowiecs an accounting of their security deposit because they did not leave a forwarding address and he did not hear anything about them until about a year after they moved out. On May 18, 2010, Schopmeyer sent a letter and a check for $8,120 to the Grabowiecs.

*Procedure*

Grabowiec commenced this action in October 2008, and the operative complaint, the second amended complaint, was filed in May 2010 (hereafter referred to as the complaint). The complaint contained causes of action against Schopmeyer for breach of contract and breach of the implied warranty of habitability (first and fifth causes of action), and bad faith retention of security deposit in violation of Civil Code section 1950.5 (seventh cause of action). It also contained causes of action against Schopmeyer, Thompson, and Falconer[1] for negligence (second cause of action), rescission (third cause of action), imposition of a constructive trust (fourth cause of action), and unjust enrichment (sixth cause of action). Schopmeyer filed a cross-complaint against Grabowiec for breach of contract.

Following a bench trial, the court ruled in Grabowiec's favor on his breach of contract and breach of the implied warranty of habitability and bad faith retention of security deposit causes of action. Prior to, and during counsel's closing argument, the trial court made several comments on the state of the evidence and in particular on

[1] Thompson and Falconer were dismissed before trial commenced.

9

Grabowiec's photographic evidence. As to the photographs of crumbs in the kitchen cabinet, the court observed "this doesn't do much for me at all except to say maybe it should have been a little cleaner." As for the pictures depicting mold under the kitchen sink, the court commented "it doesn't look like mold to me." The court commented Grabowiec's complaints about the water heater were not "even an argument" because although the water heater failed, it was replaced immediately.

During Grabowiec's counsel's argument, the court made comments as to what constituted a breach of the warranty of habitability. The court observed it depended on the totality of the circumstances and it could result from a lot of little problems, one big problem, or a combination of the two. The court further observed what might constitute a breach of the warranty of habitability was "probably a lot different in Clarksville, Illinois than it is in Newport Beach, California, if you are paying $5,800 a month rent. The expectations [of] a consumer on . . . habitability might be . . . higher than it would be if you were paying $1,200 a month. That is just the reality of the situation, and that is more can be expected in the community." During Schopmeyer's counsel's argument the court conceded bread crumb in the cabinets, cleaning the drapes, and bird droppings on the front porch were no big deal. But the fact Schopmeyer twice sent professional cleaners to clean the house, and the cleaning crews billed Schopmeyer for it, was evidence there was something to clean, i.e., "something must have been dirty."

Before the court ruled, it stated Schopmeyer had conceded there were problems with the stove and he conceded there was mold. The court observed Grabowiec's wife "likes a clean house" and their daughter's asthmatic condition "was a factor that preyed upon her [and her husband's] concerns," but the house should have been cleaned before the Grabowiecs moved in and the combination of the overall cleanliness of the house, the malfunctioning stove, and the mold constituted a breach of the implied warranty of habitability. The court directed Grabowiec's counsel to prepare a written statement of decision.

10

As relevant to the issues raised in this appeal, Grabowiec's proposed statement of decision contained only the following finding, "The Court finds that certain conditions at the subject premises constituted a violation of the warranty of habitability as set out in Civil Code [section] 1941.1. These conditions specifically included mold that was present on the premises, a defective gas stove, and the overall condition of cleanliness of the premises." (Underlining omitted.) Accordingly, Grabowiec prevailed on his fifth cause of action for breach of implied warranty of habitability and because that breach constituted a breach of the written lease, he prevailed on his breach of contract cause of action. The statement of decision also contained a finding that "Schopmeyer breached his statutory duty to return advance rent and security deposit monies . . . [and] this failure was in bad faith." Accordingly, Grabowiec prevailed on his seventh cause of action. The court found Grabowiec did not present sufficient evidence to prevail on any of his other causes of action.

The court awarded Grabowiec four months of his prepaid rent ($23,200), his $7,500 security deposit plus a penalty of double the security deposit ($22,500), plus attorney fees and costs. Schopmeyer filed objections to the proposed statement of decision; the trial court signed and entered statement of decision as proposed by Grabowiec. On May 31, 2012, the court entered judgment for Grabowiec in a total amount of $45,700.

DISCUSSION

*I. Breach of Implied Warrant of Habitability*

Schopmeyer contends the trial court improperly found he breached the implied warranty of habitability by failing to maintain the premises in compliance with Civil Code section 1941.1. We agree.

In *Green v. Superior Court* (1974) 10 Cal.3d 616, 627 (*Green*), our Supreme Court held that because "under contemporary conditions, public policy compels landlords to bear the primary responsibility for maintaining safe, clean and habitable

11

housing in our state," there is a warranty of habitability implied in residential leases in California. "This implied warranty of habitability does not require that a landlord ensure that leased premises are in perfect, aesthetically pleasing condition, but it does mean that 'bare living requirements' must be maintained. In most cases substantial compliance with those applicable building and housing code standards which materially affect health and safety will suffice to meet the landlord's obligations. . . . " (*Id.* at p. 637, fn. omitted.)

A tenant may raise a breach of the implied warranty of habitability as a defense to an unlawful detainer action (*Green, supra,* 10 Cal.3d at pp. 631-637), or a tenant may bring suit against the landlord for damages resulting from such breach (*id.* at pp. 637-638; *Landeros v. Pankey* (1995) 39 Cal.App.4th 1167, 1169.) The elements of an affirmative claim by a tenant are the existence of a material defective condition affecting the premises habitability, notice to the landlord of the condition within a reasonable time after the tenant's discovery of the condition, the landlord was given a reasonable time to correct the deficiency, and resulting damages. (*Quevedo v. Braga* (1977) 72 Cal.App.3d Supp. 1, 7-8 (*Quevedo*), disapproved on other grounds in *Knight v. Hallsthammar* (1981) 29 Cal.3d 46, 55, fn. 7 (*Knight*); see also Friedman et al., Cal. Practice Guide: Landlord-Tenant (The Rutter Group 2013) ¶ 3:100, p. 3-40.5.) Moreover, when the landlord has breached the implied warranty of habitability, the tenant is not absolved of the obligation to pay rent—rather the tenant remains liable for the reasonable rental value as determined by the court for the period the defective condition of the premises existed. (*Stoiber v. Honeychuck* (1980) 101 Cal.App.3d 903, 914 (*Stoiber*); *Hinson v. Delis* (1972) 26 Cal.App.3d 62, 70, disapproved on another ground in *Knight*, *supra,* 29 Cal.3d at p. 55, fn. 7; see also Code Civ. Proc., § 1174.2, subd. (a) [in unlawful detainer action after nonpayment of rent, where tenant proves substantial breach of habitability warranty, court determines reasonable rental value of premises in its untenantable condition].)

The standards of "tenantability" set out in Civil Code section 1941.1,
provide "guidance in determining whether a landlord has satisfied the common law
warranty of habitability." (*Green, supra,* 10 Cal.3d at pp. 637-638, fn. 23.) Civil Code
section 1941.1, subdivision (a), provides "[a] dwelling shall be deemed
untenantable[2] . . . if it *substantially lacks* any of the following affirmative standard
characteristics . . . : (1) Effective waterproofing and weather protection . . . .
[¶] (2) Plumbing or gas facilities . . . maintained in good working order. [¶] (3) A water
supply . . . capable of producing hot and cold running water . . . furnished to appropriate
fixtures, and connected to a sewage disposal system . . . . [¶] (4) Heating
facilities . . . maintained in good working order. [¶] (5) Electrical lighting, with wiring
and electrical equipment . . . maintained in good working order. [¶] (6) Building,
grounds, and appurtenances . . . kept in every part clean, sanitary, and free from all
accumulations of debris, filth, rubbish, garbage, rodents, and vermin. [¶] (7) [Garbage
facilities]. [¶] (8) Floors, stairways, and railings maintained in good repair.
[¶] (9) A locking mail receptacle for each residential unit in a residential hotel . . . ."
(Italics added.)

The standards for determining whether a landlord has breached the implied
warranty of habitability are not limited to complying with Civil Code section 1941.1.
(*Knight, supra,* 29 Cal.3d at p. 59, fn. 10.) But here the trial court's statement of decision
confirms it relied solely on Schopmeyer's violation of Civil Code section 1941.1 due to
"mold that was present on the premises, a defective gas stove, and the overall condition
of cleanliness of the premises" in finding Schopmeyer breached the implied warranty of
habitability (fifth cause of action), which in turn was a breach of contract (first cause of

---

2          "Untenantable" "means that the condition of the premises 'are not fit for
occupancy or rental.' (Black's Law Dic. (6th Ed. 1990) p. 1540, col. 1.)" (*McNairy v.
C.K. Realty* (2007) 150 Cal.App.4th 1500, 1506; see also Webster's 3d New Internat.
Dict. (1981) p. 2512, col. 3 [defines "untenantable" as "incapable of being occupied or
lived in"].)

action).  Accordingly, we limit our discussion to that finding.  And based upon our review of the factual record under the substantial evidence test (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873-874), we conclude the finding is not supported.

*A.  Mold*

We first consider the trial court's reliance on the presence of mold in the house.  Schopmeyer argues the presence of mold should not have been a consideration in determining whether the implied warranty of habitability was breached for a number of reasons including one that has merit—Grabowiec never gave Schopmeyer notice there was any mold in the house or any opportunity to remedy the claimed mold problems. Grabowiec does not respond to this argument.

Notice and reasonable time to correct the claimed defective condition in the premises are essential elements of Grabowiec's breach of implied warranty claim. (*Quevedo, supra,* 72 Cal.App.3d Supp. at pp. 7-8; see also Civ. Code, § 1942, subd. (a) [tenant may "repair and deduct" or vacate only after reasonable notice to landlord of problem and reasonable opportunity to fix].)  Not only is notice of the condition a requirement of Grabowiec's common law claim, it was an express requirement of the Mold Addendum to the lease that required the tenant to "immediately notify [l]andlord of any significant mold growth on surfaces in the [p]remises."  Grabowiec offered no evidence he or his wife ever notified Schopmeyer (or his agent Thompson) of the claimed mold in the back of the kitchen sink cabinet or on the wall behind the water heater in the garage before vacating the house.  Grabowiec's wife testified she spent five days filling out the move-in inspection report, but she made no mention of mold on the form. Although the suggestion was she did not find the mold until after they moved in, there

14

was no evidence presented by Grabowiec the claimed mold was reported to Schopmeyer so that it could be cleaned up.  For this reason the mold claim fails.[3]

B. *Overall "Cleanliness" and Malfunctioning Stove*

We turn to the two conditions of which Schopmeyer did have notice that the court relied upon in finding Schopmeyer breached the implied warranty of habitability:  the malfunctioning stove and "the overall condition of cleanliness of the premises."

The statement of decision did not identify the specific Civil Code section 1941.1 affirmative characteristics the court found to be "substantially lacking." We presume as to the stove the court deemed it to violate Civil Code section 1941.1, subdivision (a)(2), i.e., a gas stove with malfunctioning automatic igniters constituted a substantial lack of "gas facilities . . . maintained in good working order."  And the "overall condition of cleanliness" of the house constituted a substantial lack of "[b]uilding, grounds, and appurtenances at the time of the commencement of the lease or rental agreement . . . kept in every part clean, sanitary, and free from all accumulations of debris, filth, rubbish, garbage, rodents, and vermin."  (Civ. Code, § 1941.1, subd. (a)(6).)

As already noted, the standard for finding a breach of the implied warranty of habitability is whether the defect *substantially* affects health and safety—landlords are not required to guarantee "premises are in perfect, aesthetically pleasing condition . . . ." (*Green*, *supra,* 10 Cal.3d at p. 637.)  Whether the defect or code noncompliance is substantial, and the premises uninhabitable, is a question of fact.  (*Hall v. Municipal Court* (1974) 10 Cal.3d 641, 643-644.)  If there is any substantial evidence to support the

---

[3]     We need not therefore address Schopmeyer's other arguments concerning the effect of the Mold Addendum on his responsibilities vis-à-vis mold.  Nor need we consider whether the evidence supports the conclusion the spots Grabowiec's wife testified to seeing in the kitchen cabinet and on the wall of the garage that were depicted in the photographs Grabowiec presented, were mold, or whether two small areas of mold in a 3,000 square foot house rendered the premises unfit for occupancy.

15

trial court's finding, we may not disturb them on appeal. We conclude the evidence does not support the conclusion the house was uninhabitable. Although the automatic igniters on the stove were not working properly and the house was not as clean as the Grabowiecs wanted, neither support the conclusion the house was unfit for occupancy.

With regards to the stove, Friedman, *supra,* ¶ 3:30, pages 3-11 to 3-12, observes "[n]either the state codes nor court decisions specifically address maintenance of cooking, refrigeration, laundry and other major appliances that are furnished with the unit. Sometimes, however, defects in these facilities are *implicitly* covered [by the implied warranty of habitability]—e.g., if the claimed defect is in wiring or plumbing installed by the landlord, there is a code violation." Here, there was no evidence of a defect in the installation of the stove. Grabowiec and his wife testified they were concerned about a gas leak from the stove, but Grabowiec's wife testified she called the gas company to inspect it and there is no evidence the gas company found any gas leak. Schopmeyer's handyman testified there was no leak—just a malfunctioning automatic ignition on two burners. The appliance repair technician sent out by Thompson found two automatic igniters were not working but the other three worked fine. Grabowiec and his wife testified they could not use the stove at all due to the defect and had to eat every meal out because they could not cook with the stove. But there was no evidence the stove was dangerous or that the burners could not have been manually ignited until Schopmeyer was able to fix it or install a new one.

Although the house could have been cleaner when the Grabowiecs moved in, the evidence does not demonstrate it was filthy in the sense contemplated by Civil Code section 1941.1, subdivision (a)(6). The pictures submitted by the Grabowiec depicted that in this 3,000 square foot luxury home, there were some leaves and dirt in a few window tracks, some crumbs in the kitchen cabinets, a dead bug under the kitchen sink, some dirt on an air vent, and some bird droppings outside in the entry way. Grabowiec's wife indicated on the move-in/move-out inspection form everything was

16

dirty or filthy, and in response Schopmeyer twice sent professional cleaning crews out to reclean everything for her. At trial, she testified that when they vacated the house less than a month after moving in, she was no longer concerned about its cleanliness. In its oral ruling, the court suggested the Grabowiecs' daughter's asthma might have made the Grabowiecs more sensitive to the cleanliness of the house, but there is no evidence Schopmeyer or his agent Thompson were ever informed there was a need for a heightened level of cleanliness. Nor can we agree with the trial court's comments (in which Grabowiec's counsel concurred) that what constitutes an uninhabitable dwelling varies based on the location and amount of rent paid (i.e., that what constitutes a breach of implied warranty of habitability ""probably a lot different in Clarksville, Illinois than it is in Newport Beach, California, if you are paying $5,800 a month rent. The expectations [of] a consumer on . . . habitability might be . . . higher than it would be if you were paying $1,200 a month. That is just the reality of the situation, and that is more can be expected in the community.")

The evidence in this case pales in comparison to the conditions described in published cases that constituted a breach of the implied warranty of habitability. For example, in *Green, supra,* 10 Cal.3d at page 638, there was a city housing inspection report that detailed 80 violations of local housing and building codes, major defects in the building's plumbing and electrical facilities, lack of heat in four of the tenant's rooms, vermin, collapse and nonrepair of bathroom ceiling, faulty wiring, and illegally installed and dangerous stove. In *Rivera v. Sassoon* (1995) 39 Cal.App.4th 1045, 1047, there was evidence of hazardous electrical wiring, raw sewage seepage under the buildings due to broken plumbing, infestation of rats, termites and other vermin, broken and deteriorated doors and windows, lack of hot and cold running water, lack of heat, leaking roofs and leaking plumbing fixtures. In *Stoiber, supra,* 101 Cal.App.3d at page 912, a demurrer case, the tenant's complaint alleging "numerous defective and dangerous conditions were in existence, including, but not limited to leaking of sewage from the bathroom

17

plumbing; defective and dangerous electrical wiring; structural weaknesses in the walls; deteriorated flooring; falling ceiling; leaking roof; dilapidated doors; broken windows; and other unsafe and dangerous conditions[,]" and which had attached as an exhibit a copy of the "County Health Department's notice to vacate and demolish the subject premises which listed the following violations among others: heavy cockroach infestation, broken interior walls, broken deteriorated flooring on front porch, falling ceiling, deteriorated, overfused electrical wiring, lack of proper plumbing connection to sewage system in bathroom, sewage under bathroom floor, leaking roof, broken windows, and fire hazard[,]" supported a breach of implied warrant of habitability claim. Grabowiec cites no cases affirming a finding of breach of the implied warranty of habitability in which the facts are at all comparable to the situation in the present case. In short, we conclude the trial court erred in finding a breach of the warranty of habitability. Accordingly, the award of damages relating to that claim (Grabowiec's first and fifth causes of action) must be stricken.[4]

## II. *Bad Faith Retention of Security Deposit/Schopmeyer's Cross-Complaint*

In addition to awarding Grabowiec $23,200 in damages for breach of the implied warranty of habitability and breach of contract, the trial court also found in Grabowiec's favor in his seventh cause of action for bad faith retention of security deposit in violation of Civil Code section 1950.5. As damages, the trial court awarded Grabowiec the full $7,500 security deposit, plus the statutory penalty of double the deposit—a total award of $22,500. Schopmeyer raises no arguments on appeal

---

[4] In view of this conclusion, we need not address Schopmeyer's contentions that Grabowiec's wife interfered with his effort at responding to her complaints by failing to be home at the time he had arranged to meet with her, or by failing to show him the photographs she had taken. We also do not address Schopmeyer's argument Grabowiec did not give him a reasonable opportunity to fix or replace the stove.

18

concerning the award of damages for bad faith retention of security deposit.[5] Accordingly, we may modify the judgment by striking the $23,200 in damages relating to the breach of implied warranty of habitability and breach of contract causes of action that are unsupported by substantial evidence, and affirming the damages award relating to Schopmeyer's failure to timely refund Grabowiec's security deposit.

We note that while not overwhelming, there is at least some evidence in the record supporting a judgment on the security deposit cause of action. Civil Code section 1950.5, subdivision (g), requires a residential landlord, within 21 days of a tenant vacating the premises, to provide the tenant with "an itemized statement indicating the basis for, and the amount of, any security received and the disposition of the security and shall return any remaining portion of the security to the tenant." When the landlord makes a "bad faith claim or retention" of all or any portion of the security deposit, the landlord may be subject to statutory damages of up to twice the amount of the security, in addition to actual damages. (Civ. Code, § 1950.5, subd. (*l*).)

In early August 2008, Grabowiec's attorney wrote a letter to Schopmeyer in care of his agent, Thompson, giving notice of rescission and demanding return of his advance rent and security deposit. Thompson did not forward the letter to Schopmeyer and later asserted the lack of a forwarding address for Grabowiec prevented him from refunding any amounts owed. There is no explanation as to why Thompson did not contact Grabowiec's attorney. The premises were relet in November 2008. It was not until May 2010 that Schopmeyer refunded Grabowiec $8,120. The court could find Schopmeyer's failure to earlier return the $7,500 security deposit was in bad faith.

Although the record supports a finding of bad faith retention of security deposit, it does not support the amount awarded. The $22,500 awarded includes the actual security deposit ($7,500) and the statutory penalty amount ($15,000), but the

---

[5] The court also found in Grabowiec's favor on Schopmeyer's breach of contract cross-complaint and Schopmeyer does not challenge that ruling.

deposit was refunded, and therefore Grabowiec had no actual damages and only the penalty amount may stand.

## DISPOSITION

The judgment is modified to strike $30,700 from the damages award so as to reduce the award to $15,000. As modified, the judgment is affirmed. Schopmeyer is awarded his costs on this appeal.

O'LEARY, P. J.

WE CONCUR:

FYBEL, J.

IKOLA, J.

20